United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued May 3, 2002 Decided May 31, 2002 

 No. 00-5329

 Richard Drake, 
 Appellant

 v.

 Federal Aviation Administration, 
 Appellee

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 99cv02790)

 Andrew Dunlap, Student Counsel, argued the cause as 
amicus curiae in support of appellant. With him on the 
briefs were Steven H. Goldblatt, Director of the Appellate 
Litigation Program, Georgetown University Law Center, ap-
pointed by the court as amicus curiae, Wendy M. Marantz, 
Supervising Attorney, and Kristina Marlow, Student Coun-
sel.

 Richard Drake appearing pro se, was on the briefs for 
appellant.

 Madelyn E. Johnson, Assistant U.S. Attorney, argued the 
cause for appellee. With her on the brief were Roscoe C. 
Howard, Jr., U.S. Attorney, and R. Craig Lawrence, Assis-
tant U.S. Attorney. Christy A. Slamowitz, Assistant U.S. 
Attorney, entered an appearance.

 Before: Edwards, Henderson, and Garland, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Edwards.

 Edwards, Circuit Judge: This appeal arises from the Dis-
trict Court's dismissal of appellant Richard Drake's action 
against the Federal Aviation Agency ("FAA"). Drake be-
lieves that Delta Airlines infringed his legal rights when it 
processed a random drug test that Drake was required to 
take by virtue of his flight attendant position. Drake there-
fore contends that the FAA neglected its statutory responsi-
bilities in finding that Delta did not violate agency regulations 
and breached a regulatory obligation in refusing to disclose 
information bearing on that determination. The District 
Court dismissed all of Drake's claims, concluding that they 
were barred by res judicata. This was error. Nevertheless, 
we affirm the dismissal on other grounds. The efforts of 
amicus curiae to convince us otherwise were ultimately unper-
suasive.*

 Drake's requests for information are moot, because he has 
received all the documents to which he is entitled under the 
Freedom of Information Act ("FOIA"). While Drake argues 
that a since-amended FAA regulation, 49 C.F.R. s 40.37 
(1993), guaranteed him more, we defer to the agency's rea-
sonable interpretation of that provision, under which it ap-

__________
 * On August 15, 2001, the court appointed Georgetown University 
Law Center's Appellate Litigation Program as amicus curiae on 
Drake's behalf. A third-year law student, Andrew Dunlap, present-
ed argument in support of the appellant. The court commends Mr. 
Dunlap on the excellence of his oral advocacy, which greatly assist-
ed our deliberations and judgment in this case.

plies neither to requests made upon the agency itself nor to 
the broad class of information that Drake has sought here.

 Next, we conclude that Drake cannot state a claim under 
the Administrative Procedure Act ("APA") against the FAA 
based on its failure to find that Delta had violated the 
agency's drug testing rules. Under the FAA's organic stat-
ute, the agency "may dismiss a complaint without a hearing 
when the Secretary [of Transportation] or Administrator is of 
the opinion that the complaint does not state facts that 
warrant an investigation or action." 49 U.S.C. s 46101(a)(3) 
(1994) (emphasis added). The FAA's decision to do just that 
here is "committed to agency discretion by law," and may not 
be reviewed under the APA. 5 U.S.C. s 701(a)(2).

 The last two suggested bases for Drake's action are plainly 
meritless. First, Drake's complaint cannot be read to sup-
port an action under Bivens v. Six Unknown Named Agents 
of Federal Bureau of Narcotics, 403 U.S. 388 (1971). A 
Bivens action cannot be maintained against a federal agency 
such as the FAA, and Drake has neither named nor served 
any individual defendants. Finally, Drake has asserted no 
basis for a claim under the Federal Tort Claims Act 
("FTCA"). Just as the APA precludes review of the FAA's 
discretionary decision not to hold a hearing on Drake's com-
plaint against Delta, that decision cannot give rise to FTCA 
liability either.

 I. Background

 FAA regulations require that air carriers administer peri-
odic drug tests on employees who perform certain safety-
sensitive functions. See 49 C.F.R. pt. 40 (1993) ("Part 40"). 
In 1989, the Department of Transportation promulgated the 
Part 40 rules that were in effect during the times relevant to 
this case. See Procedures for Transportation Workplace 
Drug Testing Programs, 54 Fed. Reg. 49,854 (Dec. 1, 1989). 
These rules included a number of detailed requirements 
relating to the scope of drug tests and the procedural protec-
tions afforded to employees subject to testing.

 Under the applicable version of Part 40, an employee's 
positive test results had to be verified by the employer's 
Medical Review Officer ("MRO"). Before doing so, however, 
the MRO normally was required to give an employee a 
chance to discuss his test result before reporting it to the 
employer. See 49 C.F.R. s 40.33(c)(1), (5). Where there 
were questions about the accuracy or validity of a positive 
result, the MRO could order a retesting of the original 
specimen. If this reanalysis was negative, the MRO was 
required to cancel the test. 49 C.F.R. s 40.33(e). If the 
result was "scientifically insufficient for further action," the 
MRO could either declare the test negative or order a retest 
under s 40.33(e). 49 C.F.R. s 40.33(g). Moreover, in a 
provision entitled "Individual access to test and laboratory 
certification results," the FAA regulations indicated that an 
individual "shall, upon written request, have access to any 
records relating to his drug test and any records relating to 
the results of any relevant certification, review, or revocation-
of-certification proceedings." 49 C.F.R. s 40.37.

 While Part 40 by its terms conferred no private right of 
action against a carrier, employees may file a written com-
plaint with the FAA if they believe a carrier has violated the 
agency's rules or regulations. See 49 U.S.C. s 46101(a). In 
turn, the Administrator "shall investigate the complaint if 
reasonable ground appears to the ... Administrator for the 
investigation." Id. s 46101(a)(1). However, the Administra-
tor "may dismiss a complaint without a hearing when the ... 
Administrator is of the opinion that the complaint does not 
state facts that warrant an investigation or action." Id. 
s 46101(a)(3). If there is a hearing, the Administrator "shall 
issue an order to compel compliance" with the regulations "if 
the Administrator finds in an investigation" that the regula-
tions have been violated. Id. s 46101(a)(4).

 In accordance with Part 40, Delta Airlines required its 
flight attendants to undergo random drug tests as a condition 
of their employment. In 1993, Drake was selected for testing 
four times, the last on October 28. His urine sample was sent 
to Delta's designated laboratory, CompuChem Laboratories, 
Inc., which pronounced it "unsuitable for testing," indicating 

that it was somehow adulterated or abnormal. A subsequent 
report suggested that this initial result was "indicative of 
adulteration with glutaraldehyde," a substance often used to 
mask the presence of drugs in the body. This finding was 
transmitted to Dr. William Whaley, Delta's MRO, who decid-
ed to forward an aliquot of Drake's sample to another lab, 
North West Toxicology Laboratory, for further testing. Dr. 
Whaley allegedly did so without informing Drake or obtaining 
his consent.

 North West's test came back negative for glutaraldehyde, 
although it revealed a pH of below 4, which the lab consid-
ered "inconsistent with human kidney function and highly 
suggestive of adulteration." Dr. Whaley thus decided to send 
the urine for yet another retest, this one to be conducted by 
Dr. Malmoud ElSohly, who believed that he could adjust for 
the abnormal pH and determine if the sample had been 
tainted. However, Dr. ElSohly's test uncovered no positive 
indication of either drugs or adulterants. Thus, while his 
report did indicate that "the specimen might be adulterated," 
Dr. ElSohly recommended that Dr. Whaley take no action 
against Drake "because of presumed adulteration." On No-
vember 24, 1993, Dr. Whaley contacted Delta directly, report-
ing the inconclusive results to the airline's drug program 
managers. He recounted Drake's testing history, noting that 
the Part 40 regulations forbade any additional testing on the 
October 28 sample. Dr. Whaley therefore suggested that 
Drake be contacted, at which point a new specimen could be 
collected.

 On November 29, North West performed a third retest on 
Drake's original sample. This test came back positive for 
glutaraldehyde. The next day, after Delta learned of this 
result, Drake was removed from active flight status. One 
month later, he was asked to resign, and was fired when he 
refused.

 On December 28, 1994, Drake filed a pro se complaint 
against Delta in the United States District Court for the 
Eastern District of New York, arguing that the airline's 
testing procedures had violated both the Part 40 regulations 

and the Fourth Amendment. The District Court in New 
York dismissed the case on the ground that Part 40 provides 
no private right of action against a carrier and that the 
intrusion into Drake's privacy from the various retests of his 
urine was minimal. See Drake v. Delta Airlines, Inc., 923 
F. Supp. 387 (E.D.N.Y. 1996). On appeal, the Second Circuit 
affirmed as to the regulations, but reversed on the constitu-
tional issue. See Drake v. Delta Airlines, Inc., 147 F.3d 169 
(2d Cir. 1998). That aspect of the case is still pending. In 
rejecting Drake's bid to sue under Part 40, the court of 
appeals noted that Drake "could have sought redress of the 
alleged regulatory violations through administrative avenues, 
such as by filing a complaint with the Secretary of Transpor-
tation." Id. at 171 n.2.

 In September 1998, Drake formally requested that the 
FAA investigate Delta for its allegedly unlawful actions in 
processing his urine sample. Drake met with several agency 
employees, who purportedly told him that he would be given 
access to copies of all evidence and material collected during 
the FAA's investigation. Compl. in Civ. Act. No. 99-2790, at 
p 11. The FAA conducted a week-long investigation of Delta 
between November 2 and November 6, 1998.

 This inquiry was not yet completed when, on November 12, 
1998, Drake filed a second pro se lawsuit, this one against the 
FAA itself in the United States District Court for the District 
of Columbia. See Drake v. FAA, Civ. Act. No. 98-2758 
(D.D.C.) ("FAA I"). In this action, Drake alleged that the 
Part 40 regulations themselves violated the Fourth Amend-
ment as well as "procedural due process." He contended that 
Part 40 failed to provide adequate hearing opportunities for 
tested employees and should have included a private right to 
sue carriers who run afoul of the rules' requirements. 
Compl. in Civ. Act. No. 98-2758, at p p 6, 9-10. This case was 
assigned to Judge Lamberth.

 On March 25, 1999, while this matter was proceeding, the 
FAA informed Drake of the results of the agency's investiga-
tion. The FAA reported that it had found no evidence to 
support Drake's allegations against Delta. The agency also 

informed Drake that any documents uncovered by the agency 
during the course of its investigation could be released to him 
only through FOIA. Thus, "as a courtesy," the FAA inter-
preted Drake's previous request for documents as a FOIA 
request, and submitted it to the appropriate office on his 
behalf.

 Invoking s 40.37, Drake wrote to the FAA to argue that he 
had a right to information gathered during the agency's 
investigation. The FAA, however, continued to demur, insist-
ing that only FOIA, and not the regulation, applied to Drake's 
request. In April 1999, Drake was informed that although 
the FAA had at least one responsive document, that docu-
ment was exempt from disclosure under FOIA Exemption 
7(a). This exemption applies to records complied for law 
enforcement to the extent that production "could reasonably 
be expected to interfere with enforcement proceedings." 5 
U.S.C. s 52(b)(7)(A). The agency noted, however, that the 
protection of Exemption 7 would terminate when its investi-
gation of Delta was complete.

 The instant case commenced on October 20, 1999, when 
Drake filed a second pro se action against the FAA in the 
United States District Court for the District of Columbia. 
See Drake v. FAA, Civ. Act. No. 99-2790 (D.D.C.) ("FAA II"). 
In this complaint, Drake alleged that the FAA's determina-
tion that Delta had not violated Part 40 was unreasonable, 
and the product of a conspiracy between the agency and the 
airline. Compl. in Civ. Act. No. 99-2790, at p p 20-31. He 
asked that the court compel the FAA to complete a proper, 
fair investigation of Delta and also to "release all information 
of that investigation to date and in the future." Id. at p 44. 
This case was originally assigned to Judge Kessler, who 
transferred it to Judge Lamberth on February 2, 2000 as a 
related case to FAA I. Judge Lamberth had previously 
dismissed FAA I for lack of jurisdiction; he reopened the 
case following the transfer of FAA II in response to Drake's 
motion to reconsider. On July 31, 2000, however, Judge 
Lamberth granted the FAA's motion to dismiss both cases.

 As to FAA I, the District Court found that the Part 40 
regulations attacked by Drake did not violate procedural due 
process. Moreover, noting that those regulations had been 
superseded by new ones, the court declined to pass judgment 
on the constitutionality of the replacement regulations, which 
Drake had not challenged. See FAA I, Civ. Act. No. 98-2758, 
at 5-9 (D.D.C. July 31, 2000). Finally, the District Court 
concluded that no private right of action existed under Part 
40. Id. at 9.

 The District Court then dismissed Drake's action in FAA 
II, holding that the action was barred by res judicata, 
because it grew out of the same factual nucleus as did FAA I. 
See FAA II, No. 99-2790, at 3-5 (D.D.C. July 21, 2000). 
However, the District Court elected to "comment" on the 
merits, finding that Drake had failed to state a valid legal 
claim. Id. at 5.

 The District Court suggested that the federal government's 
sovereign immunity precluded Drake from obtaining the re-
lief that he sought from the FAA. As to Drake's information 
request, the court agreed with the FAA that FOIA governed, 
and that Drake was not entitled to judicial review of the 
FAA's decision to invoke Exemption 7(a), because he had 
failed to exhaust his administrative remedies. In support of 
this conclusion, the District Court read s 40.37 to apply only 
to the material referenced in its title: "test and laboratory 
certification results." The regulation did not, in the court's 
view, apply to the "body of information produced during the 
agency investigation." Id. at 8-9.

 Drake appealed both decisions. On March 16, 2001, this 
court summarily affirmed the dismissal of FAA I. See Drake 
v. FAA, No. 00-5328 (D.C. Cir. Mar. 16, 2001). However, we 
denied the FAA's motion for summary affirmance of FAA II, 
suggesting that it was not clear that the District Court's 
judgment on res judicata was a proper application of that 
doctrine. Moreover, we directed the parties to address two 
merits issues in their briefs: (1) whether appellant's request 
for information pursuant to s 40.37 is governed by FOIA; 
and (2) what is the proper disposition of appellant's claims for 

all other relief (aside from the release of information). We 
now turn to these questions.

 II. Discussion

A. Res Judicata

 The first issue presented in this appeal is whether the 
District Court correctly dismissed FAA II on res judicata 
grounds. Also known as "claim preclusion," this doctrine 
holds that "a judgment on the merits in a prior suit bars a 
second suit involving the same parties or their privies based 
on the same cause of action." Parklane Hosiery Co. v. Shore, 
439 U.S. 322, 326 n.5 (1979). Whether two cases implicate the 
same cause of action turns on whether they share the same 
"nucleus of facts." Page v. United States, 729 F.2d 818, 820 
(D.C. Cir. 1984). Thus, under res judicata, "a final judgment 
on the merits of an action precludes the parties or their 
privies from relitigating issues that were or could have been 
raised in that action." Allen v. McCurry, 449 U.S. 90, 94 
(1980) (emphasis added).

 In this case, the District Court misapplied the claim preclu-
sion doctrine. It is clear that, for the most part, the causes of 
action asserted in FAA II are different from those asserted in 
FAA I. The first case was concerned with the Part 40 
regulations as a whole, and the related allegation that the 
laxity of these regulations may have allowed Delta to violate 
Drake's rights when it processed his urine sample. In 
marked contrast, the bulk of FAA II attacks the agency's 
subsequent determination that Delta did not violate those 
regulations and the FAA's refusal to disclose information 
bearing on that determination. Compl. in Civ. Act. No. 
99-2790, at p p 23-31. Plainly, then, the claims underlying 
FAA II are based on a different nucleus of facts than were 
those advanced in FAA I.

 What is particularly noteworthy here is that many of the 
central events underlying FAA II had not even taken place at 
the time when Drake instigated FAA I. While it is not clear 
from the record when exactly the FAA prepared the investi-
gation report attacked in FAA II, it is undisputed that the 

agency did not tell Drake about its contents until March 25, 
1999. FAA I, of course, had been filed months before, on 
November 12, 1998. Moreover, Drake's claim in FAA II that 
the agency improperly disregarded the terms of 49 C.F.R. 
s 40.37 plainly arose after his first action began. It was not 
until April 12, 1999 that the FAA informed Drake that it was 
treating his request for information as one made under FOIA, 
thus rejecting his assertion that he was entitled to the 
information under s 40.37.

 Accordingly, the District Court's conclusion that Drake 
should, or could, have raised these claims in FAA I was 
misguided. Res judicata does not preclude claims based on 
facts not yet in existence at the time of the original action. 
Page, 729 F.2d at 820 & n.12; see also Stanton v. District of 
Columbia Court of Appeals, 127 F.3d 72, 78-79 (D.C. Cir. 
1997). So it is here. The doctrine does not bar a litigant 
from doing in the present what he had no opportunity to do in 
the past. Therefore, insofar as FAA II challenges the nature 
of the agency's investigation and its refusal to disclose the 
fruits of that investigation, those claims were improperly 
dismissed on res judicata grounds.

B. Drake's Request for the Release of Information

 Drake contends that the FAA has provided no reasoned 
basis for its refusal to apply 49 C.F.R. s 40.37 to his requests 
for documents gathered or generated during the agency's 
investigation of Delta. If this regulation does not apply, then 
the issue is now moot. On May 9, 2000, the FAA informed 
Drake that because its investigation of Delta was over, FOIA 
no longer barred the release of the information gathered 
during that inquiry. Thus, the bulk of what Drake had 
requested, including the FAA's Enforcement Investigation 
Report and documentation relating to his 1993 drug test, was 
released to him.

 In light of this disclosure, Drake's claim is moot, unless he 
can show that s 40.37 entitles him to certain documents that 
he has requested but not yet received. This he is unable to 
do, because the FAA reasonably interpreted that regulation 
as not applying to Drake's requests. The FAA asserts that 

Drake's demands for documents based on s 40.37 must fail, 
because the regulation is addressed to laboratories, not the 
agency, and, in any event, the regulation is limited to test and 
laboratory certification results, not agency investigatory ma-
terials. Therefore, according to the FAA, Drake was obliged 
to rely on FOIA, not s 40.37, in his quest for documents from 
the FAA. We agree.

 In the Notice of Proposed Rulemaking ("NPRM") issued to 
amend Part 40, the FAA indicated that the existing regula-
tions "require[ ] laboratories to provide certain information 
about, among other things, their HHS certifications." Proce-
dures for Transportation Workplace Drug and Alcohol Test-
ing Programs, 64 Fed. Reg. 69,076, 69,085 (Dec. 9, 1999) 
(emphasis added). This suggested that any disclosure obli-
gation imposed by s 40.37 was on the laboratories that con-
ducted the actual drug testing, or on the employers for whom 
the tests were conducted, not the FAA. Neither the NPRM 
nor the rule itself states that an employee may rely on 
s 40.37 to obtain information amassed by the FAA in the 
course of its investigation of a carrier or laboratory. More-
over, since the NPRM was aimed at "laboratories," this 
suggested that the regulation applied only to laboratory 
results and not to documents relating to FAA investigations 
of carriers.

 This interpretation of the regulation was never expressly 
advanced by the FAA when it rejected Drake's request for 
documents. Agency officials merely advised Drake that he 
was bound to use FOIA, not s 40.37, in his quest for docu-
ments. Drake also points out that s 40.37 does not expressly 
foreclose his claim and, further, that the regulation can be 
plausibly read to support his position. We agree with Drake 
that the regulation, on its face, is ambiguous. However, this 
is not fatal to FAA's position. Recent decisions of this court 
make it clear that we owe deference to an agency's interpre-
tation advanced during litigation regarding the meaning of an 
ambiguous regulation, if the position is not inconsistent with 
the agency's prior statements and actions regarding the 
disputed regulation. See Bigelow v. Dep't of Defense, 217 
F.3d 875, 878 (D.C. Cir. 2000); Akzo Nobel Salt, Inc. v. Fed. 

Mine Safety and Health Review Comm'n, 212 F.3d 1301, 
1304-05 (D.C. Cir. 2000). The FAA's interpretation here is 
consistent with the position the agency took in its NPRM and 
offers a perfectly reasonable interpretation of s 40.37, one to 
which we defer.

 In support of its interpretation, the FAA first points to 
s 40.1. This provision provides that Part 40 "applies to 
transportation employers (including self-employed individu-
als) conducting drug urine testing programs pursuant to 
regulations issued by agencies of the Department of Trans-
portation and to such transportation employers' officers, em-
ployees, agents and contractors." Thus, according to the 
FAA, the mandate of s 40.37 - like the rest of Part 40 - was 
directed to regulated carriers, such as Delta, and not to the 
FAA itself. See Br. of Appellee 19. The agency finds further 
support for this view in s 40.37's title, which refers only to 
"test and laboratory certification results." The FAA claims 
that information generated during an agency investigation of 
the kind mounted by the FAA here does not fit within the 
confines of this title. See id. at 18.

 We accede to this interpretation of s 40.37. The Supreme 
Court's seminal decision in Bowles v. Seminole Rock & Sand 
Co., 325 U.S. 410 (1945), established the basic principle that 
an agency's interpretation of one of its own regulations 
commands substantial judicial deference. That interpretation 
"becomes of controlling weight unless it is plainly erroneous 
or inconsistent with the regulation." Id. at 414. More 
recently, in Auer v. Robbins, the Court held that such defer-
ence is not to be withheld merely because the agency's 
reading of the regulation comes in form of a legal brief. See 
519 U.S. 452, 462 (1997); see also Nat'l Wildlife Federation v. 
Browner, 127 F.3d 1126, 1129 (D.C. Cir. 1997) ("The mere 
fact that an agency offers its interpretation in the course of 
litigation does not automatically preclude deference to the 
agency.").

 There are at least three preconditions for applying this so-
called Auer deference. First, the language of the regulation 
in question must be ambiguous, lest a substantively new rule 

be promulgated under the guise of interpretation. See Chris-
tensen v. Harris County, 529 U.S. 576, 588 (2000). Second, 
there must be "no reason to suspect that the interpretation 
does not reflect the agency's fair and considered judgment on 
the matter in question." Auer, 519 U.S. at 462; see also 
Bigelow, 217 F.3d at 878. Finally, the agency's reading of its 
regulation must be fairly supported by the text of the regula-
tion itself, so as to ensure that adequate notice of that 
interpretation is contained within the rule itself. See Auer, 
519 U.S. at 461.

 There is no doubt that s 40.37 is ambiguous in its reach. 
And the interpretation advanced by the FAA, which applies 
the rule only to test or laboratory certification results, and 
not to requests presented to the agency itself, resolves that 
underlying ambiguity quite sensibly. The phrase "relating to 
his or her drug test" is plastic, and can plausibly be read 
either narrowly, particularly in light of the provision's title, or 
broadly, as referring to any records bearing on or connected 
to a drug test. By focusing on the title to determine the 
scope of the text, the FAA has adopted a reasonable construc-
tion.

 The regulation is silent on the question of to whom the 
employee may present a "written request" in order to gain 
access to his or her testing records. It is not inconsistent 
with the provision - and actually quite consistent with the 
structure of the Part 40 regulations as a whole - to construe 
this silence as the agency has now done. Part 40 imposes 
obligations on regulated carriers and affiliated laboratories, 
not on the FAA itself. These are the entities that actually 
conduct the drug testing, and who therefore would generally 
maintain records relating to such tests. It therefore makes 
perfect sense to read s 40.37 to allow employees to seek such 
information from private entities.

 Accordingly, the interpretation of the regulation advanced 
by the FAA during this litigation is controlling unless we 
discern some reason to believe that it is not "fair and consid-
ered." In conducting this inquiry, we consider whether the 
agency has "ever adopted a different interpretation of the 

regulation or contradicted its position on appeal." National 
Wildlife, 127 F.3d at 1129. Where the agency's litigation 
position is consistent with its past statements and actions, 
there is good reason for the court to defer, for then the 
position seems "simply to articulate an explanation of long-
standing agency practice." Akzo Nobel, 212 F.3d at 1304; see 
also Ass'n of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 
1246, 1252 (D.C. Cir. 1998) (distinguishing between explana-
tions of a rationale implicitly adopted by the agency in its 
prior actions and explanations that offer new explanations for 
conduct previously defended on other grounds).

 So it is here. The FAA's litigation position that s 40.37 
applies neither to the FAA nor to documents relating to FAA 
investigations of carriers is in accord with the agency's han-
dling of Drake's information requests solely under FOIA and 
treating the Part 40 rules as irrelevant. The FAA did not 
vacillate or reverse itself on this point. See Akzo Nobel, 212 
F.3d at 1304-05 (concluding that the "flip-flops here mark the 
Secretary's position as the sort of 'post hoc rationalizations' to 
which courts will not defer") (quoting Martin v. OSHRC, 499 
U.S. 144, 156 (1991)). Furthermore, Drake can point to no 
prior situations during which the FAA has followed a practice 
different from the one it has invoked in this case. See 
Bigelow, 217 F.3d at 878 (deferring where there were "no 
past practices or pronouncements" inconsistent with agency's 
"current interpretation"). And, finally, as noted above, the 
FAA's litigation position finds support in the NPRM issued to 
amend Part 40.

 Accordingly, we have no reason to believe that the FAA's 
reading of s 40.37 represents anything but its fair and consid-
ered understanding. Deferring to that reasonable interpreta-
tion, we find that s 40.37 does not apply to Drake's request 
for documents, and that accordingly his claim is moot.

C. Drake's Remaining Claims

 The District Court invoked sovereign immunity to support 
its dismissal of the remainder of Drake's action. Drake 
contends that this was error, arguing that the court instead 
should have viewed his pro se allegations as three separate 

claims each of which survives the Government's 12(b)(6) 
motion. We address each of these claims in turn.

 1. APA Claim
 
 Drake claims that the FAA's decision not to find Delta in 
violation of the agency's Part 40 rules violated the APA. In 
other words, according to Drake, Delta so manifestly disobey-
ed the FAA's regulations in processing Drake's urine sample 
that the FAA abused its discretion in concluding otherwise.

 The agency's actions in this context were governed by 49 
U.S.C. s 46101. Under this provision, any person may file a 
complaint with the FAA asserting a violation of one of the 
agency's regulations. The agency is directed to look into the 
matter "if a reasonable ground appears to the Secretary [of 
Transportation] or Administrator [of the FAA] for the investi-
gation." s 46101(a)(1). Here, Drake filed such a complaint 
against Delta, and the FAA conducted an investigation. 
What happened next falls within the ambit of s 46101(a)(3), 
which provides that:

 The Secretary of Transportation or Administrator may 
 dismiss a complaint without a hearing when the Secre-
 tary or Administrator is of the opinion that the complaint 
 does not state facts that warrant an investigation or 
 action.
 
(Emphasis added.) It is this dismissal that Drake now seeks 
to challenge. We reject this challenge, because we find that 
the FAA's decision to dismiss Drake's complaint without a 
hearing is "committed to agency discretion by law," and thus 
excluded from review under the APA. 5 U.S.C. s 701(a)(2).

 While the APA embodies a "basic presumption of judicial 
review," Abbott Laboratories v. Gardner, 387 U.S. 136, 140 
(1967), s 701(a)(2) bars judicial review of agency action when 
the matter in dispute has been "committed to agency discre-
tion by law." The Supreme Court's first significant discus-
sion of s 701(a)(2) came in Citizens to Preserve Overton Park, 
Inc. v. Volpe, 401 U.S. 402 (1971). There, the Court indicated 
that this is a "very narrow exception," which applies only "in 
those rare instances where 'statutes are drawn in such broad 

terms that in a given case there is no law to apply.' " Id. at 
410 (quoting S. Rep. No. 79-752 (1945)).

 Since the Court's decision in Overton Park, the "no law to 
apply" formula has come to refer to the search for substan-
tive legal criteria against which an agency's conduct can be 
seriously evaluated. If no such "judicially manageable stan-
dards" are discernable, meaningful judicial review is impossi-
ble, and agency action is shielded from the scrutiny of the 
courts. Heckler v. Chaney, 470 U.S. 821, 830 (1985); Webster 
v. Doe, 486 U.S. 592, 599-600 (1988). In such circumstances, 
the courts have no legal norms pursuant to which to evaluate 
the challenged action, and thus no concrete limitations to 
impose on the agency's exercise of discretion. In other 
words, s 701(a)(2) encodes the principle that an agency can-
not abuse its discretion, and thus violate s 706(2)(A), where 
its governing statute confers such broad discretion as to 
essentially rule out the possibility of abuse.

 In determining whether a matter has been committed 
solely to agency discretion, we consider both the nature of the 
administrative action at issue and the language and structure 
of the statute that supplies the applicable legal standards for 
reviewing that action. See, e.g., Legal Assistance for Viet-
namese Asylum Seekers v. Dep't of State, Bureau of Consu-
lar Affairs, 104 F.3d 1349, 1353 (D.C. Cir. 1997). The 
Supreme Court has recognized that certain categories of 
administrative decisions, including refusals to take enforce-
ment actions, are presumptively outside the bounds of judicial 
review. See Chaney, 470 U.S. at 831-34; see also Lincoln v. 
Vigil, 508 U.S. 182, 191 (1993).

 In the present case, the FAA's decision to dismiss Drake's 
complaint without a hearing was equivalent to a decision not 
to commence an enforcement action. Such a hearing is a 
prerequisite to an FAA finding that a carrier has committed a 
statutory or regulatory violation. See 49 U.S.C. 
s 46101(a)(4). Here, the agency determined that no hearing 
was necessary because the facts stated in Drake's complaint 
were insufficient to warrant further action. The FAA's action 
in this case was thus analogous to an exercise of "prosecutori-

al discretion" of the sort discussed in Chaney. And, as 
Chaney makes clear, when prosecutorial discretion is at issue, 
the matter is presumptively committed to agency discretion 
by law. See Block v. SEC, 50 F.3d 1078, 1082 (D.C. Cir. 1995) 
(concluding that an agency's refusal to hold a hearing for the 
purpose of establishing the factual basis for subsequent en-
forcement action is subject to Chaney's presumption against 
judicial review).

 In an effort to avoid Chaney's presumption against judicial 
review, Drake argues that he is merely challenging the 
specific findings of the FAA that led the agency not to 
commence an enforcement action. In other words, Drake 
contends that there is "law to apply" in the sense indicated by 
the Supreme Court in Overton Park, because the agency 
made specific findings to support its judgment and these 
findings are subject to review under s 706(2)(A) of the APA. 
This is a superficially appealing argument, but it ultimately 
fails for two related reasons.

 First, it is clear that the FAA's factual findings were 
inextricably intertwined with its decision not to issue a com-
pliance order against Delta. In other words, the FAA's 
decision that the facts did not show a violation of Part 40 was 
inseparable from its decision to take no further prosecutorial 
action against the carrier. This is not to suggest that such 
agency findings are never subject to judicial review. Instead, 
our point is that when, as here, such determinations are a 
prerequisite to an enforcement action, we would read Chaney 
far too narrowly to conclude that a challenge to the adequacy 
of agency findings is not in substance a challenge to the 
agency's refusal to enforce. See Block, 50 F.3d at 1081 
(suggesting that Chaney applies not merely to an agency's 
decision not to commence enforcement action in the case of a 
recognized violation, but also to "its antecedent judgment 
upon the question of whether a violation has occurred") 
(internal quotation marks omitted).

 Second, whether this case is governed by Overton Park 
("no law to apply" so the presumption of reviewability is lost) 
or Chaney (agency action involved an exercise of prosecutori-

al discretion and presumption of non-reviewability has not 
been overcome), Drake cannot prevail. This is so because, in 
the end analysis, the statute at issue gives virtually unfet-
tered discretion to the FAA to act as it did in this case.

 Chaney's presumption against judicial review may be re-
butted where the relevant statute supplies meaningful stan-
dards to cabin the agency's otherwise plenary discretion. See 
Chaney, 470 U.S. at 832-33; see also Vigil, 508 U.S. at 193 
("Congress may always circumscribe agency discretion to 
allocate resources by putting restrictions in the operative 
statutes...."); Block, 50 F.3d at 1082 (noting that "an en-
forcement decision that would otherwise be unreviewable is 
subject to judicial review if the Congress or the agency itself 
has provided a meaningful standard for the agency to follow 
in exercising its enforcement power"). Accordingly, we may 
review the FAA decisions challenged by Drake only if the 
operative statute provides clear guidelines by which to do so, 
or otherwise evinces an intent to constrain the FAA's discre-
tion.

 In this case, however, the statute does just the opposite. 
The language of s 46101(a)(3), which set the terms for the 
FAA's decision to dismiss Drake's complaint without a hear-
ing, is highly discretionary. Indeed, a provision that allows 
the Administrator to act when she "is of the opinion that the 
complaint does not state facts that warrant an investigation," 
gives the FAA virtually unbridled discretion over such deci-
sions. The only statutory reference point is the Administra-
tor's own beliefs. Therefore, a court has no meaningful 
standard against which to judge the agency's exercise of 
discretion, at least so long as the agency's action does not 
otherwise infringe some constitutional right or protection. 
See Webster, 486 U.S. at 603-04.

 The Supreme Court has relied on an analogous distinction 
between a subjective standard (whether the agency thinks 
that a condition has been met) and an objective one (whether 
the condition in fact has been met) in deciding that agency 
action was unreviewable. In Webster, the Court held that a 
provision allowing termination of a CIA employee whenever 

the agency's Director "shall deem such termination necessary 
or advisable in the interests of the United States" precluded 
judicial review of that decision. Id. at 600 (quoting 50 U.S.C. 
s 403(c)). What may be thought necessary may not in fact be 
necessary, but a court may pass judgment only on the latter, 
not the former.

 Thus, whether this case involves a presumption of non-
reviewability under Chaney or, instead, a presumption of 
reviewability under Overton Park, Drake's claim still fails 
because there is "no law to apply." See, e.g., Claybrook v. 
Slater, 111 F.3d 904, 908-09 (D.C. Cir. 1997) (decision of 
agency representative to adjourn a meeting whenever "he 
determines it to be in the public interest" was committed to 
agency discretion by law) (emphasis added). In sum, then, it 
is clear that the relevant statutory language "fairly exudes 
deference" to the FAA, and "foreclose[s] the application of 
any meaningful judicial standard of review." Webster, 486 
U.S. at 600. We therefore have no basis upon which to 
review the FAA's decision to dismiss Drake's complaint with-
out a hearing. Appellant has therefore failed to state a claim 
under the APA.

 2. Bivens Claim
 
 We need not linger long over Drake's argument that his 
complaint states a colorable Bivens claim. The complaint 
names only the FAA itself as defendant. Drake neither 
named nor served any individual defendants. It is of course 
well-settled that Bivens liability cannot be imposed on an 
agency of the Federal Government. See FDIC v. Meyer, 510 
U.S. 471 (1994). Drake's constitutional claim against the 
FAA thus fails.

 Aware of this problem, amicus asks us to allow Drake to 
correct this pleading deficiency on remand. Because we have 
rejected all of appellant's claims, however, there is nothing to 
remand. Insofar as we are being asked to send the case back 
merely so that Drake may amend his complaint, this request 
comes too late. See Gov't of Guam v. Am. President Lines, 

28 F.3d 142, 149-51 (D.C. Cir. 1994) (holding that plaintiffs 
whose complaints are dismissed waive their right to amend 
following appeal if they failed to seek leave to amend from the 
District Court); United States ex rel. Totten v. Bombardier 
Corp., 286 F.3d 542, 552-53 (D.C. Cir. 2002) (confirming that 
this rule applies so long as the Court of Appeals affirms the 
dismissal of the complaint).

 3. FTCA Claim
 
 Finally, we reject Drake's complaint resting on the Federal 
Tort Claims Act. By its own terms, the FTCA does not 
apply to any claim that is "based upon the exercise or 
performance or the failure to exercise or perform a discre-
tionary function or duty on the part of a federal agency ... 
whether or not the discretion involved be abused." 28 U.S.C. 
s 2680(a). As our discussion of appellant's APA claim has 
demonstrated, the FAA's decision to dismiss Drake's com-
plaint without a hearing in light of its finding that Delta did 
not violate Part 40 plainly represents an exercise of the 
agency's discretion. Accordingly, the District Court's deci-
sion that Drake stated no claim under the FTCA was entirely 
correct.

 Drake argues that the FAA's governing statute contains 
certain mandatory elements that, if disregarded, could serve 
as the basis for an FTCA action. Specifically, he points to 
the provision mandating that the Administrator "shall issue 
an order to compel compliance with this part if the Secretary 
or Administrator finds in an investigation under this subsec-
tion that a person is violating this part." 49 U.S.C. 
s 46101(a)(4) (emphasis added). We have no occasion to 
address whether disobeying such a statutory command could 
give rise to FTCA liability, because there has been no such 
disobedience in this case. The whole basis for Drake's com-
plaint is that the FAA did not find a violation. Accordingly, 
whatever obligations this statutory scheme may impose on 
the FAA simply have not been triggered.

 III. CONCLUSION

 For the reasons given above, the decision of the District 
Court is affirmed.

 It is so ordered.