Richard DRAKE, Appellant

v.

**FEDERAL AVIATION
ADMINISTRATION,**
Appellee.

No. 00-5329.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 3, 2002.

Decided May 31, 2002.

Rehearing En Banc Denied July 22, 2002.

Andrew Dunlap, Student Counsel, argued the cause as amicus curiae in support of appellant. With him on the briefs were Steven H. Goldblatt, Director of the Appellate Litigation Program, Georgetown University Law Center, appointed by the

court as amicus curiae, Wendy M. Marantz, Supervising Attorney, and Kristina Marlow, Student Counsel.

Richard Drake appearing pro se, was on the briefs for appellant.

Madelyn E. Johnson, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Roscoe C. Howard, Jr., U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney. Christy A. Slamowitz, Assistant U.S. Attorney, entered an appearance.

Before: EDWARDS, HENDERSON, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

This appeal arises from the District Court's dismissal of appellant Richard Drake's action against the Federal Aviation Agency ("FAA"). Drake believes that Delta Airlines infringed his legal rights when it processed a random drug test that Drake was required to take by virtue of his flight attendant position. Drake therefore contends that the FAA neglected its statutory responsibilities in finding that Delta did not violate agency regulations and breached a regulatory obligation in refusing to disclose information bearing on that determination. The District Court dismissed all of Drake's claims, concluding that they were barred by *res judicata*. This was error. Nevertheless, we affirm the dismissal on other grounds. The efforts of amicus curiae to convince us otherwise were ultimately unpersuasive.*

Drake's requests for information are moot, because he has received all the docu-

ments to which he is entitled under the Freedom of Information Act ("FOIA"). While Drake argues that a since-amended FAA regulation, 49 C.F.R. § 40.37 (1993), guaranteed him more, we defer to the agency's reasonable interpretation of that provision, under which it applies neither to requests made upon the agency itself nor to the broad class of information that Drake has sought here.

Next, we conclude that Drake cannot state a claim under the Administrative Procedure Act ("APA") against the FAA based on its failure to find that Delta had violated the agency's drug testing rules. Under the FAA's organic statute, the agency *"may* dismiss a complaint without a hearing when the Secretary [of Transportation] or Administrator is *of the opinion* that the complaint does not state facts that warrant an investigation or action." 49 U.S.C. § 46101(a)(3) (1994) (emphasis added). The FAA's decision to do just that here is "committed to agency discretion by law," and may not be reviewed under the APA. 5 U.S.C. § 701(a)(2).

The last two suggested bases for Drake's action are plainly meritless. First, Drake's complaint cannot be read to support an action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). A *Bivens* action cannot be maintained against a federal agency such as the FAA, and Drake has neither named nor served any individual defendants. Finally, Drake has asserted no basis for a claim under the Federal Tort Claims Act ("FTCA"). Just as the APA precludes review of the FAA's discre-

---

* On August 15, 2001, the court appointed Georgetown University Law Center's Appellate Litigation Program as amicus curiae on Drake's behalf. A third-year law student, Andrew Dunlap, presented argument in support of the appellant. The court commends Mr. Dunlap on the excellence of his oral advocacy, which greatly assisted our deliberations and judgment in this case.

tionary decision not to hold a hearing on Drake's complaint against Delta, that decision cannot give rise to FTCA liability either.

## I. BACKGROUND

FAA regulations require that air carriers administer periodic drug tests on employees who perform certain safetysensitive functions. *See* 49 C.F.R. pt. 40 (1993) ("Part 40"). In 1989, the Department of Transportation promulgated the Part 40 rules that were in effect during the times relevant to this case. *See* Procedures for Transportation Workplace Drug Testing Programs, 54 Fed.Reg. 49,854 (Dec. 1, 1989). These rules included a number of detailed requirements relating to the scope of drug tests and the procedural protections afforded to employees subject to testing.

Under the applicable version of Part 40, an employee's positive test results had to be verified by the employer's Medical Review Officer ("MRO"). Before doing so, however, the MRO normally was required to give an employee a chance to discuss his test result before reporting it to the employer. *See* 49 C.F.R. § 40.33(c)(1), (5). Where there were questions about the accuracy or validity of a positive result, the MRO could order a retesting of the original specimen. If this reanalysis was negative, the MRO was required to cancel the test. 49 C.F.R. § 40.33(e). If the result was "scientifically insufficient for further action," the MRO could either declare the test negative or order a retest under § 40.33(e). 49 C.F.R. § 40.33(g). Moreover, in a provision entitled "Individual access to test and laboratory certification results," the FAA regulations indicated that an individual "shall, upon written request, have access to any records relating to his drug test and any records relating to the results of any relevant certification,

review, or revocation-of-certification proceedings." 49 C.F.R. § 40.37.

While Part 40 by its terms conferred no private right of action against a carrier, employees may file a written complaint with the FAA if they believe a carrier has violated the agency's rules or regulations. *See* 49 U.S.C. § 46101(a). In turn, the Administrator "shall investigate the complaint if reasonable ground appears to the ... Administrator for the investigation." *Id.* § 46101(a)(1). However, the Administrator "may dismiss a complaint without a hearing when the ... Administrator is of the opinion that the complaint does not state facts that warrant an investigation or action." *Id.* § 46101(a)(3). If there is a hearing, the Administrator "shall issue an order to compel compliance" with the regulations "if the Administrator finds in an investigation" that the regulations have been violated. *Id.* § 46101(a)(4).

In accordance with Part 40, Delta Airlines required its flight attendants to undergo random drug tests as a condition of their employment. In 1993, Drake was selected for testing four times, the last on October 28. His urine sample was sent to Delta's designated laboratory, Compu-Chem Laboratories, Inc., which pronounced it "unsuitable for testing," indicating that it was somehow adulterated or abnormal. A subsequent report suggested that this initial result was "indicative of adulteration with glutaraldehyde," a substance often used to mask the presence of drugs in the body. This finding was transmitted to Dr. William Whaley, Delta's MRO, who decided to forward an aliquot of Drake's sample to another lab, North West Toxicology Laboratory, for further testing. Dr. Whaley allegedly did so without informing Drake or obtaining his consent.

North West's test came back negative for glutaraldehyde, although it revealed a pH of below 4, which the lab considered

"inconsistent with human kidney function and highly suggestive of adulteration." Dr. Whaley thus decided to send the urine for yet another retest, this one to be conducted by Dr. Malmoud ElSohly, who believed that he could adjust for the abnormal pH and determine if the sample had been tainted. However, Dr. ElSohly's test uncovered no positive indication of either drugs or adulterants. Thus, while his report did indicate that "the specimen might be adulterated," Dr. ElSohly recommended that Dr. Whaley take no action against Drake "because of presumed adulteration." On November 24, 1993, Dr. Whaley contacted Delta directly, reporting the inconclusive results to the airline's drug program managers. He recounted Drake's testing history, noting that the Part 40 regulations forbade any additional testing on the October 28 sample. Dr. Whaley therefore suggested that Drake be contacted, at which point a new specimen could be collected.

On November 29, North West performed a third retest on Drake's original sample. This test came back positive for glutaraldehyde. The next day, after Delta learned of this result, Drake was removed from active flight status. One month later, he was asked to resign, and was fired when he refused.

On December 28, 1994, Drake filed a *pro se* complaint against Delta in the United States District Court for the Eastern District of New York, arguing that the airline's testing procedures had violated both the Part 40 regulations and the Fourth Amendment. The District Court in New York dismissed the case on the ground that Part 40 provides no private right of action against a carrier and that the intrusion into Drake's privacy from the various retests of his urine was minimal. *See Drake v. Delta Airlines, Inc.*, 923 F.Supp. 387 (E.D.N.Y.1996). On appeal, the Sec-

ond Circuit affirmed as to the regulations, but reversed on the constitutional issue. *See Drake v. Delta Air Lines, Inc.*, 147 F.3d 169 (2d Cir.1998). That aspect of the case is still pending. In rejecting Drake's bid to sue under Part 40, the court of appeals noted that Drake "could have sought redress of the alleged regulatory violations through administrative avenues, such as by filing a complaint with the Secretary of Transportation." *Id.* at 171 n. 2.

In September 1998, Drake formally requested that the FAA investigate Delta for its allegedly unlawful actions in processing his urine sample. Drake met with several agency employees, who purportedly told him that he would be given access to copies of all evidence and material collected during the FAA's investigation. Compl. in Civ. Act. No. 99-2790, at ¶ 11. The FAA conducted a week-long investigation of Delta between November 2 and November 6, 1998.

This inquiry was not yet completed when, on November 12, 1998, Drake filed a second *pro se* lawsuit, this one against the FAA itself in the United States District Court for the District of Columbia. *See Drake v. FAA*, Civ. Act. No. 98-2758 (D.D.C.) ("*FAA I*"). In this action, Drake alleged that the Part 40 regulations themselves violated the Fourth Amendment as well as "procedural due process." He contended that Part 40 failed to provide adequate hearing opportunities for tested employees and should have included a private right to sue carriers who run afoul of the rules' requirements. Compl. in Civ. Act. No. 98-2758, at ¶¶ 6, 9-10. This case was assigned to Judge Lamberth.

On March 25, 1999, while this matter was proceeding, the FAA informed Drake of the results of the agency's investigation. The FAA reported that it had found no evidence to support Drake's allegations

against Delta. The agency also informed Drake that any documents uncovered by the agency during the course of its investigation could be released to him only through FOIA. Thus, "as a courtesy," the FAA interpreted Drake's previous request for documents as a FOIA request, and submitted it to the appropriate office on his behalf.

Invoking § 40.37, Drake wrote to the FAA to argue that he had a right to information gathered during the agency's investigation. The FAA, however, continued to demur, insisting that only FOIA, and not the regulation, applied to Drake's request. In April 1999, Drake was informed that although the FAA had at least one responsive document, that document was exempt from disclosure under FOIA Exemption 7(a). This exemption applies to records compiled for law enforcement to the extent that production "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 52(b)(7)(A). The agency noted, however, that the protection of Exemption 7 would terminate when its investigation of Delta was complete.

The instant case commenced on October 20, 1999, when Drake filed a second *pro se* action against the FAA in the United States District Court for the District of Columbia. *See Drake v. FAA*, Civ. Act. No. 99-2790 (D.D.C.) ("*FAA II*"). In this complaint, Drake alleged that the FAA's determination that Delta had not violated Part 40 was unreasonable, and the product of a conspiracy between the agency and the airline. Compl. in Civ. Act. No. 99-2790, at ¶¶ 20-31. He asked that the court compel the FAA to complete a proper, fair investigation of Delta and also to "release all information of that investigation to date and in the future." *Id.* at ¶ 44. This case was originally assigned to Judge Kessler, who transferred it to Judge Lam-

berth on February 2, 2000 as a related case to *FAA I*. Judge Lamberth had previously dismissed FAA I for lack of jurisdiction; he reopened the case following the transfer of *FAA II* in response to Drake's motion to reconsider. On July 31, 2000, however, Judge Lamberth granted the FAA's motion to dismiss both cases.

As to *FAA I*, the District Court found that the Part 40 regulations attacked by Drake did not violate procedural due process. Moreover, noting that those regulations had been superseded by new ones, the court declined to pass judgment on the constitutionality of the replacement regulations, which Drake had not challenged. *See FAA I*, Civ. Act. No. 98-2758, at 5-9 (D.D.C. July 31, 2000). Finally, the District Court concluded that no private right of action existed under Part 40. *Id.* at 9.

The District Court then dismissed Drake's action in *FAA II*, holding that the action was barred by *res judicata*, because it grew out of the same factual nucleus as did *FAA I*. *See FAA II*, No. 99-2790, at 3-5 (D.D.C. July 21, 2000). However, the District Court elected to "comment" on the merits, finding that Drake had failed to state a valid legal claim. *Id.* at 5.

The District Court suggested that the federal government's sovereign immunity precluded Drake from obtaining the relief that he sought from the FAA. As to Drake's information request, the court agreed with the FAA that FOIA governed, and that Drake was not entitled to judicial review of the FAA's decision to invoke Exemption 7(a), because he had failed to exhaust his administrative remedies. In support of this conclusion, the District Court read § 40.37 to apply *only* to the material referenced in its title: "test and laboratory certification results." The regulation did not, in the court's view, apply to the "body of information produced during the agency investigation." *Id.* at 8-9.

Drake appealed both decisions. On March 16, 2001, this court summarily affirmed the dismissal of *FAA I. See Drake v. FAA*, No. 00-5328, 2001 wl 410463 (D.C.Cir. Mar. 16, 2001). However, we denied the FAA's motion for summary affirmance of *FAA II*, suggesting that it was not clear that the District Court's judgment on *res judicata* was a proper application of that doctrine. Moreover, we directed the parties to address two merits issues in their briefs: (1) whether appellant's request for information pursuant to § 40.37 is governed by FOIA; and (2) what is the proper disposition of appellant's claims for all other relief (aside from the release of information). We now turn to these questions.

## II. DISCUSSION

### A. Res Judicata

 The first issue presented in this appeal is whether the District Court correctly dismissed *FAA II* on *res judicata* grounds. Also known as "claim preclusion," this doctrine holds that "a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). Whether two cases implicate the same cause of action turns on whether they share the same "nucleus of facts." *Page v. United States*, 729 F.2d 818, 820 (D.C.Cir.1984). Thus, under *res judicata*, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or *could have been raised* in that action." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980) (emphasis added).

 In this case, the District Court misapplied the claim preclusion doctrine. It is clear that, for the most part, the causes of action asserted in *FAA II* are different from those asserted in *FAA I*. The first case was concerned with the Part 40 regulations as a whole, and the related allegation that the laxity of these regulations may have allowed Delta to violate Drake's rights when it processed his urine sample. In marked contrast, the bulk of *FAA II* attacks the agency's *subsequent* determination that Delta did not violate those regulations and the FAA's refusal to disclose information bearing on that determination. Compl. in Civ. Act. No.99-2790, at ¶ ¶ 23-31. Plainly, then, the claims underlying *FAA II* are based on a different nucleus of facts than were those advanced in *FAA I*.

What is particularly noteworthy here is that many of the central events underlying *FAA II* had not even taken place· at the time when Drake instigated *FAA I*. While it is not clear from the record when exactly the FAA prepared the investigation report attacked in *FAA II*, it is undisputed that the agency did not tell Drake about its contents until March 25, 1999. *FAA I*, of course, had been filed months before, on November 12, 1998. Moreover, Drake's claim in *FAA II* that the agency improperly disregarded the terms of 49 C.F.R. § 40.37 plainly arose after his first action began. It was not until April 12, 1999 that the FAA informed Drake that it was treating his request for information as one made under FOIA, thus rejecting his assertion that he was entitled to the information under § 40.37.

 Accordingly, the District Court's conclusion that Drake should, or could, have raised these claims in *FAA I* was misguided. *Res judicata* does not preclude claims based on facts not yet in existence at the time ·of the original action. *Page*, 729 F.2d at 820 & n. 12; *see also Stanton v. District of Columbia Court of*

*Appeals,* 127 F.3d 72, 78-79 (D.C.Cir.1997). So it is here. The doctrine does not bar a litigant from doing in the present what he had no opportunity to do in the past. Therefore, insofar as *FAA II* challenges the nature of the agency's investigation and its refusal to disclose the fruits of that investigation, those claims were improperly dismissed on *res judicata* grounds.

## B. Drake's Request for the Release of Information

■ Drake contends that the FAA has provided no reasoned basis for its refusal to apply 49 C.F.R. § 40.37 to his requests for documents gathered or generated during the agency's investigation of Delta. If this regulation does not apply, then the issue is now moot. On May 9, 2000, the FAA informed Drake that because its investigation of Delta was over, FOIA no longer barred the release of the information gathered during that inquiry. Thus, the bulk of what Drake had requested, including the FAA's Enforcement Investigation Report and documentation relating to his 1993 drug test, was released to him.

In light of this disclosure, Drake's claim is moot, unless he can show that § 40.37 entitles him to certain documents that he has requested but not yet received. This he is unable to do, because the FAA reasonably interpreted that regulation as not applying to Drake's requests. The FAA asserts that Drake's demands for documents based on § 40.37 must fail, because the regulation is addressed to laboratories, not the agency, and, in any event, the regulation is limited to test and laboratory certification results, not agency investigatory materials. Therefore, according to the FAA, Drake was obliged to rely on FOIA, not § 40.37, in his quest for documents from the FAA. We agree.

In the Notice of Proposed Rulemaking ("NPRM") issued to amend Part 40, the FAA indicated that the existing regulations "require[ ] *laboratories* to provide certain information about, among other things, their HHS certifications." *Procedures for Transportation Workplace Drug and Alcohol Testing Programs,* 64 Fed. Reg. 69,076, 69,085 (Dec. 9, 1999) (emphasis added). This suggested that any disclosure obligation imposed by § 40.37 was on the laboratories that conducted the actual drug testing, or on the employers for whom the tests were conducted, not the FAA. Neither the NPRM nor the rule itself states that an employee may rely on § 40.37 to obtain information amassed by the FAA in the course of its investigation of a carrier or laboratory. Moreover, since the NPRM was aimed at "laboratories," this suggested that the regulation applied only to laboratory results and not to documents relating to FAA investigations of carriers.

■ This interpretation of the regulation was never expressly advanced by the FAA when it rejected Drake's request for documents. Agency officials merely advised Drake that he was bound to use FOIA, not § 40.37, in his quest for documents. Drake also points out that § 40.37 does not expressly foreclose his claim and, further, that the regulation can be plausibly read to support his position. We agree with Drake that the regulation, on its face, is ambiguous. However, this is not fatal to FAA's position. Recent decisions of this court make it clear that we owe deference to an agency's interpretation advanced during litigation regarding the meaning of an ambiguous regulation, if the position is not inconsistent with the agency's prior statements and actions regarding the disputed regulation. *See Bigelow v. Dep't of Defense,* 217 F.3d 875, 878 (D.C.Cir.2000); *Akzo Nobel Salt, Inc. v. Fed. Mine Safety and Health Review Comm'n,* 212 F.3d 1301, 1304-05 (D.C.Cir.2000). The FAA's

interpretation here is consistent with the position the agency took in its NPRM and offers a perfectly reasonable interpretation of § 40.37, one to which we defer.

In support of its interpretation, the FAA first points to § 40.1. This provision provides that Part 40 "applies to transportation employers (including self-employed individuals) conducting drug urine testing programs pursuant to regulations issued by agencies of the Department of Transportation and to such transportation employers' officers, employees, agents and contractors." Thus, according to the FAA, the mandate of § 40.37 – like the rest of Part 40 – was directed to regulated carriers, such as Delta, and not to the FAA itself. *See* Br. of Appellee 19. The agency finds further support for this view in § 40.37's title, which refers only to "test and laboratory certification results." The FAA claims that information generated during an agency investigation of the kind mounted by the FAA here does not fit within the confines of this title. *See id.* at 18.

■ We accede to this interpretation of § 40.37. The Supreme Court's seminal decision in *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945), established the basic principle that an agency's interpretation of one of its own regulations commands substantial judicial deference. That interpretation "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Id.* at 414, 65 S.Ct. at 1217. More recently, in *Auer v. Robbins*, the Court held that such deference is not to be withheld merely because the agency's reading of the regulation comes in form of a legal brief. *See* 519 U.S. 452, 462, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997); *see also Nat'l Wildlife Federation v. Browner*, 127 F.3d 1126, 1129 (D.C.Cir. 1997) ("The mere fact that an agency of-

fers its interpretation in the course of litigation does not automatically preclude deference to the agency.").

■ There are at least three preconditions for applying this socalled *Auer* deference. First, the language of the regulation in question must be ambiguous, lest a substantively new rule be promulgated under the guise of interpretation. *See Christensen v. Harris County*, 529 U.S. 576, 588, 120 S.Ct. 1655, 1663, 146 L.Ed.2d 621 (2000). Second, there must be "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Auer*, 519 U.S. at 462, 117 S.Ct. at 911; *see also Bigelow*, 217 F.3d at 878. Finally, the agency's reading of its regulation must be fairly supported by the text of the regulation itself, so as to ensure that adequate notice of that interpretation is contained within the rule itself. *See Auer*, 519 U.S. at 461, 117 S.Ct. at 911.

There is no doubt that § 40.37 is ambiguous in its reach. And the interpretation advanced by the FAA, which applies the rule only to test or laboratory certification results, and not to requests presented to the agency itself, resolves that underlying ambiguity quite sensibly. The phrase "relating to his or her drug test" is plastic, and can plausibly be read either narrowly, particularly in light of the provision's title, or broadly, as referring to any records bearing on or connected to a drug test. By focusing on the title to determine the scope of the text, the FAA has adopted a reasonable construction.

The regulation is silent on the question of to whom the employee may present a "written request" in order to gain access to his or her testing records. It is not inconsistent with the provision – and actually quite consistent with the structure of the Part 40 regulations as a whole – to construe this silence as the agency has

now done. Part 40 imposes obligations on regulated carriers and affiliated laboratories, not on the FAA itself. These are the entities that actually conduct the drug testing, and who therefore would generally maintain records relating to such tests. It therefore makes perfect sense to read § 40.37 to allow employees to seek such information from private entities.

■ Accordingly, the interpretation of the regulation advanced by the FAA during this litigation is controlling unless we discern some reason to believe that it is not "fair and considered." In conducting this inquiry, we consider whether the agency has "ever adopted a different interpretation of the regulation or contradicted its position on appeal." *National Wildlife,* 127 F.3d at 1129. Where the agency's litigation position is consistent with its past statements and actions, there is good reason for the court to defer, for then the position seems "simply to articulate an explanation of longstanding agency practice." *Akzo Nobel,* 212 F.3d at 1304; *see also Ass'n of Bituminous Contractors, Inc. v. Apfel,* 156 F.3d 1246, 1252 (D.C.Cir.1998) (distinguishing between explanations of a rationale implicitly adopted by the agency in its prior actions and explanations that offer new explanations for conduct previously defended on other grounds).

■ So it is here. The FAA's litigation position that § 40.37 applies neither to the FAA nor to documents relating to FAA investigations of carriers is in accord with the agency's handling of Drake's information requests solely under FOIA and treating the Part 40 rules as irrelevant. The FAA did not vacillate or reverse itself on this point. *See Akzo Nobel,* 212 F.3d at 1304-05 (concluding that the "flip-flops here mark the Secretary's position as the sort of '*post hoc* rationalizations' to which courts will not defer") (quoting *Martin v. OSHRC,* 499 U.S. 144, 156, 111 S.Ct. 1171,

1178, 113 L.Ed.2d 117 (1991)). Furthermore, Drake can point to no prior situations during which the FAA has followed a practice different from the one it has invoked in this case. *See Bigelow,* 217 F.3d at 878 (deferring where there were "no past practices or pronouncements" inconsistent with agency's "current interpretation"). And, finally, as noted above, the FAA's litigation position finds support in the NPRM issued to amend Part 40.

Accordingly, we have no reason to believe that the FAA's reading of § 40.37 represents anything but its fair and considered understanding. Deferring to that reasonable interpretation, we find that § 40.37 does not apply to Drake's request for documents, and that accordingly his claim is moot.

## C. Drake's Remaining Claims

The District Court invoked sovereign immunity to support its dismissal of the remainder of Drake's action. Drake contends that this was error, arguing that the court instead should have viewed his *pro se* allegations as three separate claims each of which survives the Government's 12(b)(6) motion. We address each of these claims in turn.

### 1. *APA Claim*

Drake claims that the FAA's decision not to find Delta in violation of the agency's Part 40 rules violated the APA. In other words, according to Drake, Delta so manifestly disobeyed the FAA's regulations in processing Drake's urine sample that the FAA abused its discretion in concluding otherwise.

■ The agency's actions in this context were governed by 49 U.S.C. § 46101. Under this provision, any person may file a complaint with the FAA asserting a violation of one of the agency's regulations.

The agency is directed to look into the matter "if a reasonable ground appears to the Secretary [of Transportation] or Administrator [of the FAA] for the investigation." § 46101(a)(1). Here, Drake filed such a complaint against Delta, and the FAA conducted an investigation. What happened next falls within the ambit of § 46101(a)(3), which provides that:

> The Secretary of Transportation or Administrator may dismiss a complaint without a hearing when the Secretary or Administrator is *of the opinion* that the complaint does not state facts that warrant an investigation or action.

(Emphasis added.) It is this dismissal that Drake now seeks to challenge. We reject this challenge, because we find that the FAA's decision to dismiss Drake's complaint without a hearing is "committed to agency discretion by law," and thus excluded from review under the APA. 5 U.S.C. § 701(a)(2).

While the APA embodies a "basic presumption of judicial review," *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967), § 701(a)(2) bars judicial review of agency action when the matter in dispute has been "committed to agency discretion by law." The Supreme Court's first significant discussion of § 701(a)(2) came in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). There, the Court indicated that this is a "very narrow exception," which applies only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.* at 410, 91 S.Ct. at 820 (quoting S.Rep. No. 79-752 (1945)).

■■■■ Since the Court's decision in *Overton Park*, the "no law to apply" formula has come to refer to the search for substantive legal criteria against which an

agency's conduct can be seriously evaluated. If no such "judicially manageable standards" are discernable, meaningful judicial review is impossible, and agency action is shielded from the scrutiny of the courts. *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1654, 84 L.Ed.2d 714 (1985); *Webster v. Doe*, 486 U.S. 592, 599-600, 108 S.Ct. 2047, 2051-2052, 100 L.Ed.2d 632 (1988). In such circumstances, the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion. In other words, § 701(a)(2) encodes the principle that an agency cannot abuse its discretion, and thus violate § 706(2)(A), where its governing statute confers such broad discretion as to essentially rule out the possibility of abuse.

■■■■ In determining whether a matter has been committed solely to agency discretion, we consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action. *See, e.g., Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104 F.3d 1349, 1353 (D.C.Cir.1997). The Supreme Court has recognized that certain categories of administrative decisions, including refusals to take enforcement actions, are presumptively outside the bounds of judicial review. *See Chaney*, 470 U.S. at 831-34, 105 S.Ct. at 1655-57; *see also Lincoln v. Vigil*, 508 U.S. 182, 191, 113 S.Ct. 2024, 2030, 124 L.Ed.2d 101 (1993).

■■■■ In the present case, the FAA's decision to dismiss Drake's complaint without a hearing was equivalent to a decision not to commence an enforcement action. Such a hearing is a prerequisite to an FAA finding that a carrier has committed a

statutory or regulatory violation. *See* 49 U.S.C. § 46101(a)(4). Here, the agency determined that no hearing was necessary because the facts stated in Drake's complaint were insufficient to warrant further action. The FAA's action in this case was thus analogous to an exercise of "prosecutorial discretion" of the sort discussed in *Chaney*. And, as *Chaney* makes clear, when prosecutorial discretion is at issue, the matter is presumptively committed to agency discretion by law. *See Block v. SEC*, 50 F.3d 1078, 1082 (D.C.Cir.1995) (concluding that an agency's refusal to hold a hearing for the purpose of establishing the factual basis for subsequent enforcement action is subject to *Chaney*'s presumption against judicial review).

In an effort to avoid *Chaney*'s presumption against judicial review, Drake argues that he is merely challenging the *specific findings* of the FAA that led the agency not to commence an enforcement action. In other words, Drake contends that there is "law to apply" in the sense indicated by the Supreme Court in *Overton Park*, because the agency made specific findings to support its judgment and these findings are subject to review under § 706(2)(A) of the APA. This is a superficially appealing argument, but it ultimately fails for two related reasons.

First, it is clear that the FAA's factual findings were inextricably intertwined with its decision not to issue a compliance order against Delta. In other words, the FAA's decision that the facts did not show a violation of Part 40 was inseparable from its decision to take no further prosecutorial action against the carrier. This is not to suggest that such agency findings are never subject to judicial review. Instead, our point is that when, as here, such determinations are a prerequisite to an enforcement action, we would read *Chaney* far too narrowly to conclude that a challenge to

the adequacy of agency findings is not in substance a challenge to the agency's refusal to enforce. *See Block*, 50 F.3d at 1081 (suggesting that *Chaney* applies not merely to an agency's decision not to commence enforcement action in the case of a recognized violation, but also to "its antecedent judgment upon the question of whether a violation has occurred") (internal quotation marks omitted).

Second, whether this case is governed by *Overton Park* ("no law to apply" so the presumption of reviewability is lost) or *Chaney* (agency action involved an exercise of prosecutorial discretion and presumption of non-reviewability has not been overcome), Drake cannot prevail. This is so because, in the end analysis, the statute at issue gives virtually unfettered discretion to the FAA to act as it did in this case.

*Chaney*'s presumption against judicial review may be rebutted where the relevant statute supplies meaningful standards to cabin the agency's otherwise plenary discretion. *See Chaney*, 470 U.S. at 832-33, 105 S.Ct. at 1656; *see also Vigil*, 508 U.S. at 193, 113 S.Ct. at 2031 ("Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes. . . ."); *Block*, 50 F.3d at 1082 (noting that "an enforcement decision that would otherwise be unreviewable is subject to judicial review if the Congress or the agency itself has provided a meaningful standard for the agency to follow in exercising its enforcement power"). Accordingly, we may review the FAA decisions challenged by Drake only if the operative statute provides clear guidelines by which to do so, or otherwise evinces an intent to constrain the FAA's discretion.

In this case, however, the statute does just the opposite. The language of § 46101(a)(3), which set the terms for the FAA's decision to dismiss Drake's com-

plaint without a hearing, is highly discretionary. Indeed, a provision that allows the Administrator to act when she "*is of the opinion* that the complaint does not state facts that warrant an investigation," gives the FAA virtually unbridled discretion over such decisions. The only statutory reference point is the Administrator's own beliefs. Therefore, a court has no meaningful standard against which to judge the agency's exercise of discretion, at least so long as the agency's action does not otherwise infringe some constitutional right or protection. *See Webster*, 486 U.S. at 603-04, 108 S.Ct. at 2053–54.

The Supreme Court has relied on an analogous distinction between a subjective standard (whether the agency thinks that a condition has been met) and an objective one (whether the condition in fact has been met) in deciding that agency action was unreviewable. In *Webster*, the Court held that a provision allowing termination of a CIA employee whenever the agency's Director "shall *deem* such termination necessary or advisable in the interests of the United States" precluded judicial review of that decision. *Id.* at 600, 108 S.Ct. at 2051 (quoting 50 U.S.C. § 403(c)). What may be *thought* necessary may not in fact *be* necessary, but a court may pass judgment only on the latter, not the former.

Thus, whether this case involves a presumption of nonreviewability under *Chaney* or, instead, a presumption of reviewability under *Overton Park*, Drake's claim still fails because there is "no law to apply." *See, e.g., Claybrook v. Slater*, 111 F.3d 904, 908-09 (D.C.Cir.1997) (decision of agency representative to adjourn a meeting whenever "he *determines* it to be in the public interest" was committed to agency discretion by law) (emphasis added). In sum, then, it is clear that the relevant statutory language "fairly exudes deference" to the FAA, and "foreclose[s]

the application of any meaningful judicial standard of review." *Webster*, 486 U.S. at 600, 108 S.Ct. at 2051. We therefore have no basis upon which to review the FAA's decision to dismiss Drake's complaint without a hearing. Appellant has therefore failed to state a claim under the APA.

### 2. Bivens *Claim*

■ We need not linger long over Drake's argument that his complaint states a colorable *Bivens* claim. The complaint names only the FAA itself as defendant. Drake neither named nor served any individual defendants. It is of course well-settled that *Bivens* liability cannot be imposed on an agency of the Federal Government. *See FDIC v. Meyer*, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Drake's constitutional claim against the FAA thus fails.

■ Aware of this problem, amicus asks us to allow Drake to correct this pleading deficiency on remand. Because we have rejected all of appellant's claims, however, there is nothing to remand. Insofar as we are being asked to send the case back merely so that Drake may amend his complaint, this request comes too late. *See Gov't of Guam v. Am. President Lines*, 28 F.3d 142, 149-51 (D.C.Cir. 1994) (holding that plaintiffs whose complaints are dismissed waive their right to amend following appeal if they failed to seek leave to amend from the District Court); *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552-53 (D.C.Cir.2002) (confirming that this rule applies so long as the Court of Appeals *affirms* the dismissal of the complaint).

### 3. *FTCA Claim*

■ Finally, we reject Drake's complaint resting on the Federal Tort Claims Act. By its own terms, the FTCA does not apply to any claim that is "based upon

the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency ... whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). As our discussion of appellant's APA claim has demonstrated, the FAA's decision to dismiss Drake's complaint without a hearing in light of its finding that Delta did not violate Part 40 plainly represents an exercise of the agency's discretion. Accordingly, the District Court's decision that Drake stated no claim under the FTCA was entirely correct.

Drake argues that the FAA's governing statute contains certain mandatory elements that, if disregarded, could serve as the basis for an FTCA action. Specifically, he points to the provision mandating that the Administrator "*shall* issue an order to compel compliance with this part if the Secretary or Administrator finds in an investigation under this subsection that a person is violating this part." 49 U.S.C. § 46101(a)(4) (emphasis added). We have no occasion to address whether disobeying such a statutory command could give rise to FTCA liability, because there has been no such disobedience in this case. The whole basis for Drake's complaint is that the FAA did *not* find a violation. Accordingly, whatever obligations this statutory scheme may impose on the FAA simply have not been triggered.

## III. CONCLUSION

For the reasons given above, the decision of the District Court is affirmed.

*It is so ordered.*